# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>All funds on deposit up to a total of $75,000.00 in Bank of America account number 237041857577, in the name of Lewis Revenue Group L.L.C. | )<br>)<br>)<br>)<br>) |

Case No.  1:20MJ169-1

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE BY TELEPHONE OR OTHER
## RELIABLE ELECTRONIC MEANS

· I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___Middle___ District of ___North Carolina___ is subject to forfeiture to the United States of America under ___18___ U.S.C. § __981(a)(1)(C)__ *(describe the property)*:

All funds on deposit up to a total of $75,000.00 in Bank of America account number 237041857577, in the name of Lewis Revenue Group L.L.C.

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

/s/ Alberto Sanabria, United States Postal Inspector, USPIS
_____
*Applicant's signature*

Alberto Sanabria, United States Postal Inspector, USPIS
_____
*Printed name and title*

In accordance with Rule 4.1(b)(2)(A), the Applicant attested under oath to the contents of this Application, which was submitted to me by reliable elecronic means, on this _23rd_ day of June, 2020, at 5:15 PM a.m./p.m.

Date: __6/23/2020  5:15PM__

_____
*Judge's signature*

City and state:  __Durham, NC__

Joe L. Webster, United States Magistrate Judge
_____
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE SEARCH OF:

**4046 BATTLEGROUND AVE, APT 3G, GREENSBORO, NC 27410**

IN THE MATTER OF THE SEIZURE OF:

**CERTAIN FUNDS IN BANK OF AMERICA ACCOUNT 237035544184, BANK OF AMERICA ACCOUNT 237041857577, AND SQUARE, INC. ACCOUNT 9PZH61WZG013X**

Case No. 1:20MJ169-1

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH AND SEIZURE WARRANTS

I, Alberto G. Sanabria, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am a United States Postal Inspector with the United States Postal Inspection Service ("USPIS"), and have been so employed for the past seven years. During this time, I have been assigned to the Financial Crimes team where my duties include the investigation of fraud-related criminal statutes, including, but not limited to, wire fraud and money laundering. I have received formal classroom training from the United States Postal Service Inspection Service ("USPIS") during the 12-week Postal Inspector Basic Training Academy in Potomac, Maryland. I have received formal instruction from U.S. Postal Inspectors as well as other federal, state, and local law enforcement agents who have done extensive work in the areas of mail theft, bank fraud, and identity theft. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic. Based on my training and experience, I am familiar with the current method of

operation that individuals and groups are using to fraudulently solicit victims, via electronic mail and other means, to send money in exchange for financial assistance.

## STATUTES VIOLATED, PREMISES TO BE SEARCHED, AND PROPERTY TO BE SEIZED

2.     Based on the facts as set forth in this affidavit, I submit there is probable cause to believe that Brandon Rashad Lewis ("LEWIS"), president of Lewis Revenue Group, LLC ("LRG"), has committed violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1956 (Money Laundering), and 1957 (Engaging in Monetary Transaction in Property Derived from Specific Unlawful Activity) (collectively, the "SUBJECT OFFENSES").

3.     This affidavit is made in support of an application for a warrant to search the location specifically described in Attachment A, the premises located at 4046 Battleground Avenue, Apartment 3G, Greensboro, North Carolina, 27410 (the "SUBJECT PREMISES"). This request also includes any computers, cell phones, and other electronic devices found at the SUBJECT PREMISES during the execution of the search warrant, which are owned or controlled by Brandon Rashad Lewis ("LEWIS"), or his business, Lewis Revenue Group, LLC ("LRG"). As set forth herein, there is probable cause to believe that evidence of the SUBJECT OFFENSES, which is more specifically described in Attachment B of this Affidavit, will be found on the SUBJECT PREMISES. The facts and information in this affidavit are based upon my personal knowledge as well as the observations of other law enforcement agents and others involved in the investigation.

2

4.     Additionally, I make this affidavit in support of applications for seizure warrants for:

     a.     All funds on deposit up to a total of $27,379.04 in Bank of America account number 237035544184 in the name of DBA Lewis Revenue Group, Brandon Lewis Sole Prop;

     b.     All funds on deposit up to a total of $75,000.00 in Bank of America account number 237041857577 in the name of Lewis Revenue Group L.L.C.; and

     c.     All funds on deposit up to a total of $6,570.00 in Square account identification number 9PZH61WZG013X in the name of Lewis Revenue Group.

Probable cause exists to believe that such monies constitute or are derived from proceeds traceable to offenses constituting "specified unlawful activity" (as defined in Title 18, United States Code, Section 1956(c)(7)), specifically violations of Title 18, United States Code, Sections 1343 (wire fraud), and are therefore subject to seizure and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

5.     Concurrent with this application, the government is seeking authority for three search warrants under the Electronic Communications Privacy Act (18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A)) (collectively, the "ECPA Warrants"), including:

     a.     A search warrant to require A2 Hosting, Inc. (hereinafter "A2 Hosting") to disclose to the government copies of the information (including the content of communications) relating to the following email accounts stored at premises controlled by A2 Hosting: (1) brandon@helpthemedia.com; and (2) info@helpthemedia.com.

     b.     A search warrant to require The Endurance International Group, Inc. (hereinafter "Endurance International") to disclose to the government copies of the information (including the content of communications)

3

relating to the following email accounts stored at premises controlled by Endurance International: (1) brandon@lrg-group.net; (2) hello@americanrelief.org; and (3) media@americanrelief.org.

c. A search warrant to require Hawk Host Inc. (hereinafter "Hawk Host") to disclose to the government copies of the information (including the content of communications) relating to the following email accounts stored at premises controlled by Hawk Host: (1) brandon@lewisrevenuegroup.com; and (2) info@lewisrevenuegroup.com.

Separate affidavits have been submitted in support of each of the ECPA Warrants.

6. The facts and information in this affidavit are based upon my personal knowledge as well as the observations of other law enforcement agents and others involved in the investigation.

7. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## JURISDICTION

8. This Court has jurisdiction to issue the requested search and seizure warrants to obtain evidence of a crime; contraband, fruits of a crime, or other items illegally possessed; or property designed for use, or used in committing a crime as defined by Rule 41(c)(1)-(3).

## PROBABLE CAUSE

9. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18, United States Code, Section 1343 (Wire Fraud), Section 1956 (Laundering of Monetary Instruments), and Section 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful

4

Activity) have been committed by LEWIS. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## Probable Cause Summary

10.    As set forth in greater detail below, there is probable cause to believe that LEWIS, who resides and has committed the acts described below in the Middle District of North Carolina, has committed violations of the wire fraud and money laundering statutes because, beginning in or around April 2020, LEWIS created a "COVID-19 Relief Fund" purportedly managed and overseen by LEWIS as president of LRG and with supposed funding from well-known corporations. Through targeted email marketing, Facebook ads, and other methods, LEWIS directed potential grant applicants to the "lewisrevenuegroup.com" website, which instructed applicants to fill out an application for the fund. LEWIS promised "guaranteed funds" of between $12,500 and $15,000 in exchange for an upfront "reservation fee" of between $995 and $1200, respectively. The April 2020 roll-out of LEWIS' COVID-19 Relief Fund coincided with—and took advantage of—small business owners' desperation in light of the challenges they faced seeking COVID-19 relief funds through official government programs. LEWIS encouraged potential grant applicants to research him and his fund, directing them to websites with purported news articles about LEWIS and the fund. However, the investigation suggests that these supposed news articles were largely either paid content likely financed by LEWIS or hosted on a website that LEWIS controlled. In the eleven days between April 16 and 27, 2020 alone, at least $112,040 from 113 individuals or entities was paid to LEWIS, nearly all of which included an invoice memo for "Obtain Relief Grant;" however, the government is not aware of any individuals or entities who have received their funds. Moreover, in May 2020, LEWIS created another purported relief fund called the "American Relief Fund." LEWIS created a separate website, "americanrelief.org,"

5

through which he offered a $5,000 grant for individuals and small businesses. On the website, LEWIS claimed that the "American Relief Fund" was sponsored and funded by multiple, well-known corporations and even used trademarks and/or logos of those corporations. After speaking with law enforcement, at least three of the corporations have denied any affiliation with LEWIS or the American Relief Fund, and made clear that they did not grant LEWIS or LRG permission to use their intellectual property.

## The CARES Act

11. In or around March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for expansion of others, including programs created and/or administered by the United States Small Business Administration ("SBA").

### *The Economic Injury Disaster Loan Program*

12. One source of relief provided by the CARES Act was the expansion of the SBA's existing disaster-related program, the Emergency Injury Disaster Loan ("EIDL"), which provides loan assistance for small businesses and other eligible entities through low interest loans of up to $2 million that can provide vital economic support to help overcome the temporary loss of revenue due to COVID-19. Additionally, as of the end of March 2020, the CARES Act authorized up to $10 billion in grants or "advances" of up to $10,000 each, to be provided within three days of a successful application and that did not need to be repaid.

13. The EIDL Program does not require payment of an upfront or "reservation" fee and does not "guarantee" funds to all who apply. In fact, during and shortly after the expanded EIDL

6

Program roll out in early April 2020, it was widely reported that, although the grants of up to $10,000 were supposed to have been provided to small business owners within three days of successfully applying, "[d]emand for the EIDL loans and grants quickly overwhelmed the system, leaving many applicants without funds weeks later . . . .The SBA . . . ha[d] received well over 3 million applications [and] . . . [a] shortage of funds threaten[ed] to limit the size of grants and loans small businesses receive."[1]

### DOJ Coordinates Nationwide Effort to Combat COVID-19 Fraud Schemes

14.     On March 19, 2020, United States Deputy Attorney General Jeffrey Rosen issued a national directive through each of the United States Attorney's Offices to prioritize and combat coronavirus-related fraud.

15.     In the course of my duties as a United States Postal Inspector, I was made aware of an email complaint related to claims LEWIS made associated with the SBA relief grants and loans and his business, LRG.

### LEWIS Advertises the Purported "COVID-19 Relief Grant" and Fund through Targeted Email Marketing, Directing Small Business Owners to a Promotional Article on the Website "LewisRevenueGroup.com"

16.     On or about April 15, 2020, I reviewed a complaint filed by a small business owner located in New York ("Complainant 1"), regarding a suspicious email Complainant 1 received on or about April 13, 2020 from brandon@lewisrevenuegroup.com. The body of the email contained the following message:

> I contacted you through the chamber of commerce website. This email is very important. You have probably heard about the SBA's COVID-19 relief funds for small businesses. Many people are

---

[1] Washington Post, April 15, 2020 *available at*
https://www.washingtonpost.com/business/2020/04/15/another-sba-program-is-severely-backlogged-running-low-funds/.

> making a huge mistake on the SBA's application that completely
> disqualifies you from receiving funds. Read the article below to
> learn about this huge mistake:
> https://lewisrevenuegroup.com/relief-article.html.

The signature line at the end of the email listed Brandon Lewis as the president of LRG. On April 22, 2020, I received information about a second complainant ("Complainant 2") who also received an email from brandon@lewisrevenuegroup.com on or about April 13, 2020, containing the same content. Complainant 2 is the executive director of a business in New York.

17. Both Complainant 1 and Complainant 2 were able to provide email header information associated with the emails, which identifies the following Internet Protocol ("IP") address as being associated with the sender: 173.94.187.242.[2] As described in greater detail below, this IP address is linked to emails and phone numbers associated with LEWIS, LRG, and the SUBJECT PREMISES.

18. The email hyperlink embedded on both emails— https://lewisrevenuegroup.com/relief-article.html—directed users to a webpage within lewisrevenuegroup.com titled, "The Most Important Article You Can Read, Don't lose out on COVID-19 relief funds for your business." The website's author identified himself as "Brandon Lewis, President and Founder of investment firm Lewis Revenue Group." Moreover, the website purported to provide guidance on "how to receive a guaranteed $15,000 relief grant for your small business." The website also purported to provide information regarding SBA emergency relief grant and the "huge mistake" that purportedly disqualifies small business owners from receiving

---

[2] The email header is a code snippet in a Hypertext Markup Language email, which contains metadata about the sender, recipient, IP address, email's route to get to the inbox, and various authentication details and enables investigators to, among other things, identify and trace the source of the email through its "IP Address," as was done here.

8

the SBA grant. In addition, the website stated that "the fund has up to $250 million available for small businesses (and up to $150 million for individuals)." A screenshot of the https://lewisrevenuegroup.com/relief-article.html webpage as it appeared on or about April 16, 2020, is attached hereto as Exhibit 1.

19. The investigation has revealed that the lewisrevenuegroup.com domain is hosted by Namecheap. A review of the "Contact Us" section of the lewisrevenuegroup.com domain lists info@lewisrevenuegroup.com as the contact email address for inquiries. Records obtained from Namecheap reveal that LEWIS purchased and created the lewisrevenuegroup.com domain on July 12, 2019. The username on the account is listed as "Rushindo" while the user address, phone number, and email address associated with the domain have all been previously linked to LEWIS. Furthermore, the login history on the account related to user "Rushindo" shows the IP address 173.94.187.242 as the primary IP address used to login to Namecheap servers from May 2017 to May 2020. Records obtained from Namecheap also confirm that LEWIS purchased and created three additional domain names hosted by Namecheap, including: (i) helpthemedia.com; (ii) lrg-group.net; and (iii) americanrelief.org. My review of LEWIS' Bank of America account records also reflect payments to Namecheap for these domain names during this time period.

**LEWIS Promises "Guaranteed" Funding In Exchange for an Upfront "Reservation Fee"**

20. On his webpage "https://lewisrevenuegroup.com/relief-article.html," LEWIS instructed potential grant applicants "how to get a guaranteed $15,000 grant for your small business (in addition to the SBA grant)." LEWIS advised that small businesses can "purchase a reservation for $1200" to receive a grant through the COVID-19 Relief Fund. LEWIS stated that "[f]or all reservation holders, I will send you a link to the application as soon as the relief fund is open for applications, which is early next month." LEWIS went on to explain:

9

Once the relief fund is open for applications, your reservation holds your $15,000 grant for 7 days. If you have a reservation you are guaranteed to be awarded the $15,000 grant as long as you submit your application within the first 7 days of the relief fund being open for applications.

...

Grants will be dispersed via direct deposit beginning two weeks after the relief fund is open for applications. Everyone that is awarded a grant will receive an email that instructs you to be on the look out for a direct deposit at your bank.

21.     LEWIS explained that "[a]s the creator and administrator of this relief fund, I have the sole power and authority to reserve grants for small businesses." LEWIS went on to guarantee that "[e]very approved small business application will receive exactly $15,000. Unlike the SBA grants, it doesn't matter how many employees you have. Everyone gets $15,000 if your application is approved." LEWIS states that the grants are issued on a "first come first serve basis" and cautions that "the grants [will] be gone within the first few hours of the relief fund being open for applications."

22.     The website directed users to "purchase a reservation and lock in your $15,000 grant," through a link titled "click here." On April 16, 2020, I clicked on the link which directed me to a secure "Square" checkout site that was non-operational at that time. Square, Inc. (hereinafter "Square") is a financial services and payment processing company that allows businesses to accept and receive credit card payments. From on or about April 16, 2020 to April 24, 2020, I periodically checked that particular Square checkout site and noticed the site remained non-operational. Upon checking the site on or about April 25, 2020, I observed the Square checkout link was active and listed the following information: "Lewis Revenue Group." "Reservation for COVID-19 Relief Grant" and "$1,200," followed by fields that allowed a user to

10

enter an email address, full name, and credit card information. A screenshot of the Square checkout site as it appeared on April 30, 2020, is attached hereto as Exhibit 2.

23. The website further described how LEWIS is the creator and administrator of the relief fund, and has sole power and authority to reserve grants for small business owners and claimed: "[o]ur investment firm set up this COVID-19 relief fund!"

## LEWIS Falsely Touts that LRG and the COVID-19 Relief Fund are Affiliated with and Sponsored by Well-Known Corporations

24. The webpage https://lewisrevenuegroup.com/relief-article.html also claimed that LRG "worked together with multiple corporations to organize the largest corporate funded COVID-19 relief fund to date." The website stated that "the fund has up to $250 million available for small businesses (and up to $150 million for individuals)."

25. To persuade users "why you can trust me to provide 100% accurate information about this new relief fund" the website stated that LRG has been featured on websites such as USA Weekly, NBC News, CBS News, Boston Herald, Fox News, and Forbes. However, our investigation suggests that this purported news coverage was largely either paid content financed by LEWIS or hosted on a website that LEWIS controlled.

26. On April 10, 2020, an article titled "New COVID-19 Relief Fund for Individuals and Small Businesses" appeared on "CBS19news.com." CBS 19 News is a licensed commercial television station based in Charlottesville, VA. Closer inspection of the CBS 19 News article reveals that it was actually a press release distributed by the independent third-party content provider, ABNewswire.com. ABNewswire is a press release distribution service where users can create their own press releases and have the press release distributed through a network of outlets, such as the CBS 19 News. Review of records obtained from PayPal reveal that, from 2017 to

11

2019, LEWIS paid ABNewswire approximately $400 for services listed as single press release distribution and monthly subscriptions for multiple press release distributions.

27.     Open source searches reveal that the same press release distributed by ABNewswire also appeared on at least the following three websites: WFXG Fox News in Augusta, Georgia; WRCB-TV in Chattanooga, Tennessee; and MarketWatch, a financial news outlet headquartered in New York, New York.

28.     The press release, also available on ABNewswire.com, announced the following information:

> The new COVID-19 relief fund is being funded by a group of corporations that have pooled funds. It is rumored that some of those corporations include AT&T, Exxon Mobil, General Motors, Home Depot and Target. The official list of corporate funders will be listed on the relief fund's website when it launches in the upcoming weeks. The relief fund was set up by Brandon Lewis, President of Lewis Revenue Group, an investment firm in North Carolina. Lewis also administers and oversees the relief fund.

The press release also contains a link directing users to the website "covid19grant.org" to complete the application. The press release lists the following information under "Media Contact:"

> Company Name: Lewis Revenue Group
> Contact Person: Brandon Lewis
> Email: brandon@lewisrevenuegroup.com
> Phone: 1 (888) 221-9073
> Country: United States
> Website: http://covid19grant.org

29.     On April 16, 2020, I reviewed the "covid19grant.org" website which listed the following information, "COVID-19 Relief Grant Coming Soon, Begin Application COMING SOON . . . ." Our investigation revealed that covid19grant.org is hosted by GoDaddy.com, LLC (hereinafter "GoDaddy"). Records obtained from GoDaddy reveal that LEWIS purchased and created the covid19grant.org domain on or about April 9, 2020. The address, phone number and

12

email address associated with the domain have all been previously linked to LEWIS. Further, LEWIS paid for covid19grant.org using a credit card bearing his name on a computer accessing the internet via the IP address 173.94.187.242, which has been linked to LEWIS and the SUBJECT PREMISES.

30.     Further, through open source searches, I was unable to locate any information to suggest that the well-known corporations referenced in the press release — AT&T, Exxon Mobil, General Motors, Home Depot and Target — are, in fact, affiliated with LRG, LEWIS, or the COVID-19 Relief Fund.

31.     PayPal records also reveal that, since 2017, LEWIS has paid for press release services and used online digital platforms to facilitate the posting of press releases he is believed to have created on websites such as Forbes, Huffington Post, and USA Weekly. As an example, PayPal records show that on or about August 17, 2017, LEWIS paid the merchant "fiverr.com," an online freelance writing marketplace, $52.50 for services titled, "Write and publish your guest post on Forbes."[3]

32.     Financial records also reveal a history of payments to numerous online services related to website "traffic bots." These traffic bots are known, in part, as non-human website traffic generators that create the impression that a website has more views than it really does. Additionally, payment records show that LEWIS conducted purchases on websites that sell fictitious or fabricated social media followers, "likes," and "views," to assist users with quickly

---

[3] On the webpage "https://lewisrevenuegroup.com/relief-article.html" (which was sent to Complainants 1 and 2 via email), LEWIS claimed that "Forbes magazine interviewed me on March 17th about the SBA relief grants." LEWIS does appear to have been interviewed by a Forbes contributor on or around that date.

13

building a social media profile. In my training and experience, individuals who engage in the use of these media to fabricate online presence are likely to do so in an effort to make their website or social media page—and underlying business—appear more popular or legitimate than it really is.

## LEWIS Advertises the Purported "COVID-19 Relief Fund" through Facebook Ads, Directing Small Business Owners to the Website "USAWeekly.com"

33. On April 23, 2020, I learned of a complaint by a small business owner ("Complainant 3") regarding LEWIS and LRG. On April 15, 2020, Complainant 3 saw a Facebook advertisement from "USA Weekly," which automatically directed Complainant 3 to the following webpage: "https://usaweekly.com/home/2020/04/14/guaranteed-12500-covid-19-relief-grant-for-small-businesses/." A review of this webpage shows it to be a USA Weekly press release written in the style of a news article claiming that small businesses can receive $12,500 or more through the COVID-19 Relief Fund offered by LEWIS listing LEWIS as an entrepreneur and president of LRG. It specifically states that LEWIS came up with the idea to assist small businesses with the relief fund and claims that the COVID-19 Relief Fund has at least $600 million in relief grants available for small businesses. In order for users to secure the $12,500 (or greater) grant—which does not need to be repaid—they must pay an upfront fee of $995.

34. Complainant 3 subsequently emailed the contact associated with the USA Weekly advertisement to express interest in receiving the grant. Complainant 3 received an email response from the email address brandon@lrg-group.net, which has also been linked to LEWIS and LRG, as described in another affidavit filed concurrently today. That email promised to assist Complainant 3 with obtaining COVID-19 relief funds totaling $12,500 or more within 30 to 60 days. The email additionally stated that in order for Complainant 3 to receive the funds, a service charge of $995 would have to be paid through a Square payment link provided in the email. The signature line on the email identified the sender as "Brandon." The IP address found within the

14

email header information of this email was also discovered to be 173.94.187.242 (*i.e.*, the same IP address that sent emails to other individuals, as described above in paragraph 19, which has been linked to LEWIS, LRG and the SUBJECT PREMISES). As indicated above at paragraph 19, records from Namecheap reveal that LEWIS purchased and created lewisrevenuegroup.com on July 12, 2019.

35.     Complainant 3 responded to the email requesting to speak with someone over the phone about six small businesses Complainant 3 owned. On April 16, 2020, Complainant 3 received a phone call from (336) 558-2563 and spoke with an individual who identified himself as, and is believed to be, LEWIS. This is the same phone number that LEWIS provided to various service providers discussed herein, including Namecheap, GoDaddy, and Square, and which investigators also confirmed as being associated with LEWIS and LRG via a law enforcement database. LEWIS confirmed the $12,500 payments were guaranteed grants that did not have to be paid back and the $995 fee would be refunded if Complainant 3 did not receive the funds. LEWIS also stated he had access to non-profit organizations and major corporations that funded the account. LEWIS additionally told Complainant 3 that he secured funding from 32 corporations and had received grants for all of his small business owners due to his access and connections. LEWIS also advised that Complainant 3 could dispute the credit card charges if something went wrong.

36.     Later that day, Complainant 3 emailed brandon@lrg-group.net with details related to the six businesses for which Complainant 3 wished to receive grants and LEWIS replied with an email containing six separate Square links containing invoices of $995 for each of the six businesses. A review of the Square payment invoices show the following terms:

15

> Lewis Revenue Group will obtain $12,500 or more in COVID-19
> relief funds for client within 30 to 60 days. The funds will be
> obtained from corporations, foundations, and non-profits.[;]
> Lewis Revenue Group will apply for the relief funds on behalf of
> client. [;]
> These funds do NOT have to be paid back.[; and]
> If Lewis Revenue Group unsuccessful at obtaining at least $12,500
> in COVID-19 relief funds within 30 to 60 days, client will receive a
> full 100% refund.

Additionally, the Square invoices list the following address for LRG: 4046 Battleground Ave., Suite 206, Greensboro, NC 27410. The property located at 4046 Battleground Avenue is a residential apartment complex and does not have "suites" or an apartment/unit "206."

37. On or about April 17, 2020, Complainant 3, concerned about the statement that credit card charges could be disputed if the grants were not approved, emailed LEWIS asking for references. LEWIS responded by sending Complainant 3 links to websites such as Forbes and USA Weekly.

38. Complainant 3, who has a background in online marketing and social media, undertook to independently verify the legitimacy of LEWIS and LRG as well as the USA Weekly Facebook ad and website prior to filing a complaint with law enforcement. Complainant 3 provided investigators with records that show certain aspects of the USA Weekly Facebook page, such as the number of users or fans and the page owner, were fabricated to promote the USA Weekly website, including that the profile picture associated with the sole user of the USA Weekly Facebook page is a widely-used image and not unique to that user.

39. As described previously in this affidavit, LEWIS' financial records show that he had previously paid for press release services and used online digital platforms to facilitate the posting of articles he is suspected of creating on USA Weekly. A WHOIS inquiry into the domain USAWeekly.com (*i.e.,* the parent domain of the webpage

16

https://usaweekly.com/home/2020/04/14/guaranteed-12500-covid-19-relief-grant-for-small-businesses/) reveals it to be a domain hosted by GoDaddy. GoDaddy records show that domain was registered by LEWIS on February 19, 2018. Additionally, GoDaddy records show the physical address of 3859 Battleground Ave., Greensboro, NC 27410 as being associated with this particular domain, which, as described below, was listed on the LRG website, but, is neither associated with LEWIS nor a real address.

### Lewis Revenue Group Is Not a Licensed Investment Firm or Charitable Organization

40.     LewisRevenueGroup.com describes LEWIS' company as an "investment firm with a focus on the tech space," including software development and information technology services. The website additionally states that LRG, "provide[s] clients with, an array of municipal banking and underwriting products. Through our financing strategies, client-centric modeling, credit analyses and a strong sales and trading platform, we help minimize the cost of borrowing and enhance debt flexibility." North Carolina state law requires that both financial institutions and entities offering insurance products be licensed in the state. A search of current North Carolina state-chartered bank and trust companies reveals that neither LEWIS nor LRG is a regulated financial institution in the state of North Carolina. Similarly, a search of the North Carolina Department of Insurance reveals that neither LEWIS nor LRG is licensed to provide insurance products in the state of North Carolina.

41.     The investigation further revealed that neither LEWIS nor LRG is registered in the state of North Carolina as an investment firm, as required by law. Searches in the records of the Financial Industry Regulatory Authority ("FINRA") and the United States Securities and Exchange Commission ("SEC"), further reveal that neither LEWIS nor LRG is registered as a member of FINRA, or as a registered Investment Adviser with the SEC, as is generally required

17

for firms that manage more than $25 million. Open source searches for LEWIS and LRG show no independent confirmation that he or the corporation are a legitimate investment firm operating in North Carolina.

42.     The investigation also revealed that neither LEWIS nor LRG is registered in the state of North Carolina as a charity. Under North Carolina Law, any organization or person that intends to directly solicit contributions must register as a charity through the North Carolina Charities Division. A search of the North Carolina Charitable Solicitations and Licensing database revealed, however, that neither LEWIS nor LRG is registered to fundraise in North Carolina. Additionally, open source searches for LEWIS and LRG failed to show any confirmation (other than on LEWIS' own websites) that LEWIS, or LRG, are affiliated in any way with sponsor or benefactor corporations or organizations which, according to the https://lewisrevenuegroup.com/relief-article.html webpage, have donated or raised a total of $400 million.

### Contrary to Information on the LRG Website, LRG's Only Office Location is LEWIS' Current Residence, *i.e.*, the SUBJECT PREMISES

43.     LewisRevenueGroup.com identifies LRG's business address as 3859 Battleground Avenue, Suite 206, Greensboro, NC 27410. On April 17, 2020, I attempted to verify the business was being operated at the 3859 Battleground Avenue location. After being unsuccessful in locating suite 206 for that address, I called the property manager for the business complex. The manager advised that suite 206 did not exist at the 3859 Battleground Avenue location. Additionally, when asked if there were any tenants by the name of LEWIS or LRG, the manager said there were no tenants at the business complex by those names.

44.     In or around October of 2019, LEWIS filed articles of incorporation with the North Carolina Department of the Secretary of State in the name of "Lewis Revenue Group, LLC." The

18

articles of incorporation list LEWIS as the organizer and member of LRG and provide the following business address of LRG and provide the following business address: 4046 Battleground Avenue, 2B, Greensboro, NC 27410. Research and surveillance reveals that this location is not a commercial property. Rather, this is the apartment where LEWIS lived at the time LRG was incorporated. The following telephone number is also listed as being associated with the business: (336) 558-2563. A law enforcement database search of this phone number confirms it to be associated with LEWIS.

45. In or around February of 2020, LEWIS moved within the same apartment building from Apartment 2B to the SUBJECT PREMISES, Apartment 3G. The investigation has revealed that LEWIS, through LRG, has operated continuously, during the move from Apartment 2B to 3G. A periodic review of United States Postal Service mailings for the SUBJECT PREMISES during the month of April 2020 and May 2020 confirmed that LRG, LEWIS and his roommate, C.K., were receiving mail at the SUBJECT PREMISES.

### Analysis of LEWIS' Merchant and Personal Financial Accounts Revealed Significant Activity, Including More than 100 Payments of $995 and Associated with "Obtaining Relief Grant[s]" From April 15, 2020 to April 27, 2020

46. Records obtained from Square show that LEWIS created a merchant account with Square, account identification number 9PZH61WZG013X, on December 16, 2018, under the business name "Lewis Revenue Group." LEWIS linked his Square account to his Bank of America ("BOA") checking account ending in 4184 the same day. Additionally, the Square account records show that LEWIS listed brandon@helpthemedia.com as his primary email contact, together with the name, date of birth, social security number, address, and phone number as all being linked to LEWIS. Account login records identify the IP address 173.94.187.242 as being the primary IP

19

address used to log into LEWIS' Square account. This is the same IP address associated with the email accounts and SUBJECT PREMISES.

47. The Square records show detailed payment information including transaction date, incoming payment amount, customer IP address information and invoice notes related to each incoming charge.

48. Analysis performed on LEWIS' Square account ending G013X found 113 payments made to LEWIS between April 15, 2020 and April 27, 2020 totaling $112,040.00 traceable to the COVID-19 Relief Fund scheme. Of these payments, 109 were in the amount of $995 and included the following invoice memo: "Obtain Relief Grant." Three additional payments in the amount of $995 did not include an invoice memo. One payment in the amount of $600 included the following invoice memo: "Obtain Relief Grant (Deposit to Hold Spot)." The timeframe, invoice amount, and/or invoice memo were consistent with indicators relating to the purported COVID-19 Relief Fund grant and associated "reservation fee" detailed by interviewed complainants and victims.

49. Some of the invoice memos also listed the specific names of the businesses making the purchases. I discovered the invoices that listed the business names were associated with other Square invoices that were linked together through the same IP address. This is consistent with a customer who owns multiple businesses and submits several Square payments using the same computer, which would capture the same IP address. As previously referenced in this affidavit, Complainant 3 received six Square invoices each for $995 which listed each of the businesses under the invoice name. Similarly, the invoice name section of the Square records also listed the following businesses that were linked through the same IP address as seen below in Table 1.

20

**Table 1**

*Square Customer IP Address and Invoice Name Link*

| Date | IP Address | Invoice Name |
|------|-----------|--------------|
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 1 |
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 2 |
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 3 |
| 4/20/2020 | Ending 108.18 | Obtain Relief Grant for Business 4 |
| | | |
| 4/22/2020 | Ending 135.159 | Obtain Relief Grant for Business 5 |
| 4/22/2020 | Ending 135.159 | Obtain Relief Grant for Business 6 |
| | | |
| 4/22/2020 | Ending 229.178 | Obtain Relief Grant for Business 7 |
| 4/22/2020 | Ending 229.178 | Obtain Relief Grant for Business 8 |
| | | |
| 4/23/2020 | Ending 191.54 | Obtain Relief Grant for Business 9 |
| 4/23/2020 | Ending 191.54 | Obtain Relief Grant for Business 10 |

As part of the investigation, I have undertaken to identify and interview the victim business owners listed above who have submitted payments to LEWIS through Square.

### *Victim 1*

50.     On June 3, 2020, I interviewed the victim who paid the above Square invoices associated with Businesses 1 through 4 on April 20, 2020 ("Victim 1"). Victim 1 is the principal owner of Business 1 and Business 2. Victim 1's relative is the principal owner of Business 4 and a second relative is the principal owner of Business 3. Business 1, 2, 3 and 4 are each located outside of North Carolina in Ohio. Victim 1 advised that the second relative sent Victim 1 the same USA Weekly website link previously mentioned in paragraph 33 of this affidavit. Victim 1 stated the USA Weekly article contained information about guaranteed grants of $12,500 for small businesses that did not have to be repaid. Victim 1 also mentioned the article stated the $995 fee to apply for the grants, which would be funded by major corporations, would be refunded if the applicant did not receive the grants.

21

51.     Victim 1 reviewed the information on the website and subsequently conducted online research on LEWIS and the COVID-19 Relief Fund to confirm the legitimacy of the grant. LEWIS' significant online presence as well as his representation as being a legitimate business owner influenced Victim 1's decision to apply for the grants.

52.     On April 20, 2020, LEWIS corresponded with Victim 1 via brandon@lewisrevenuegroup.com, stating:

> Since you contacted us, it is safe to assume you understand a little about what we are doing to help small businesses. In a nutshell, if you have 500 employees or less, we can help you obtain COVID-19 relief funds from corporations/foundations totaling $12,500 or more within 30 to 60 days. Even sole proprietors and independent contractors are eligible. These funds do NOT have to be paid back. These are not loans. No minimum revenue requirements. We charge $995 for this service. Once payment is made, we will email you a form to complete with information about your business. Once the form is completed, we will take care of everything from there and apply for the funds with corporations/foundations. Once you have been awarded the relief funds, we will contact you and let you know. We offer a full money back guarantee if you don't receive at least $12,500 in relief funds within 30 to 60 days. As you have mentioned, we have been bombarded with emails after several news outlets featured us, therefore we are only accepting a few more clients. If you would like to move forward, please let me know and send me your full name and company name. I will send you an invoice that includes all the terms. You mentioned having several companies/non-profits. We can secure relief funds for them all, though you will be billed separately for each organization.

53.     Victim 1 authorized LEWIS to proceed and LEWIS emailed Victim 1 four separate Square invoices for each of the businesses. Victim 1 made four payments of $995.00 to LEWIS via credit card the same day.

54.     Victim 1 also advised that each of the four businesses, which have been grossly impaired as a result of COVID-19 restrictions, would be severely damaged if they did not receive

22

the promised grant funding or refund of the application fees. As of June 16, 2020, Victim 1 had not received the promised Covid-19 Relief Grant funds, or a refund.

***Victim 2***

55.     On June 4, 2020, I interviewed an individual located in Michigan ("Victim 2"). Victim 2, co-owner of Business 9 and 10, paid the above Square invoices associated with those businesses on April 23, 2020. On or about April 20, 2020, Victim 2 saw an article on Facebook that Victim 2 believed to be from the USA Today publication. Victim 2 recalled the advertisement listed information about guaranteed grants of $12,500 for small businesses. The advertisement additionally promised applicants a money back guarantee for the initial application fee of $995.

56.     After reviewing the advertisement, Victim 2 independently researched the company mentioned in the advertisement, LRG. Victim 2 emailed LEWIS on or about April 20, 2020, at brandon@lewisrevenuegroup.com regarding Victim 2's interest in obtaining a grant. LEWIS responded from brandon@lrg-group.net and described details of the grant. Victim 2 requested assurances from LEWIS that Victim 2 would not get "ripped-off" and, in response, LEWIS emailed a link to a USA Weekly article describing the COVID-19 Relief Fund. Victim 2 mistook the USA Weekly article for the newspaper publication, USA Today, which Victim 2 believed lent LRG legitimacy and factored into Victim 2's decision to pay the $995 "reservation fee" for Business 9 and 10.

### Analysis of LEWIS' Financial Records Reveals Transfer of Likely Victim Funds into LEWIS' Bank of America Accounts

57.     On April 28, 2020, I received records from BOA related to three accounts held by LEWIS. The signature card for BOA business account 237035544184 shows the account title listed as "DBA LEWIS REVENUE GROUP" and "BRANDON LEWIS SOLE PROP." The signature line, dated December 28, 2016, identifies LEWIS as "President." On that same day,

23

LEWIS also opened business savings account 237035544197 and used the same account title as the checking account. LEWIS provided his North Carolina Driver's License bearing #26677686 to open both accounts. Additionally, BOA records revealed that on October 28, 2019, LEWIS opened a third BOA account, business checking account 237041857577, in the name of "LEWIS REVENUE GROUP L.L.C." Furthermore, the login history for LEWIS' accounts show that he accessed the BOA website to log into his account from an electronic device with the IP address 173.94.187.242.

58. Analysis performed on the Square account ending G013X and LEWIS' BOA account ending in 4184 confirms that, between April 17 and 27, 2020, of the 113 Square payments made by likely victims, 106 of those payments totaling $105,470 were transferred from the Square account into LEWIS' BOA account ending in 4184. Additionally, records show that Square grouped the 106 individual Square payments made by customers related to the Covid-19 Relief Fund into eleven separate transfers, minus the Square fee (approximately 2.9%), and transferred the net amount into LEWIS' BOA account ending in 4184. Table 2 below shows the eleven Square transfers, date of activity, estimated Square fee conversion, and net amount transferred to LEWIS' BOA account.

**Table 2**

*Summary of Aggregated Square Transactions and Net to BOA 4184*

| Date of Activity | Original Amount | Estimated Conversion Rate | Net Amount to Bank Account | No. of Payments |
|---|---|---|---|---|
| 4/15/20-4/16/20 | $11,940.00 | 0.970693 | $11,590.08 | 12 |
| 4/18/20-4/19/20 | $7,960.00 | 0.970693 | $7,726.72 | 8 |
| 4/18/20-4/19/20 | $7,960.00 | 0.970693 | $7,726.72 | 8 |
| 4/19/20-4/20/20 | $4,975.00 | 0.970693 | $4,829.20 | 5 |
| 4/20/20 | $17,910.00 | 0.970693 | $17,385.12 | 18 |
| 4/21/20-4/22/20 | $9,950.00 | 0.970693 | $9,658.40 | 10 |

24

| | | | | |
|---|---|---|---|---|
| 4/22/20 | $7,960.00 | 0.970693 | $7,726.72 | 8 |
| 4/22/20-4/24/20 | $20,895.00 | 0.970693 | $20,282.64 | 21 |
| 4/24/20-4/25/20 | $11,940.00 | 0.970693 | $11,590.08 | 12 |
| 4/26/20-4/27/20 | $2,985.00 | 0.970693 | $2,897.52 | 3 |
| 4/27/20 | $995.00 | 0.970693 | $965.84 | 1 |
| **TOTAL** | **$105,470** | | **$102,379.04** | **106** |

59.    A detailed examination of these records shows that LEWIS used monies obtained in connection with the COVID-19 Relief Fund for personal expenses.  Between April 15, 2020 and April 16, 2020, for example, LEWIS received twelve separate incoming payments of $995 from customers paying invoices through Square.  Ten of the twelve payments list "Obtain Relief Grant" as the invoice name.  The aggregate amount for all twelve transactions, $11,940, was then reduced by the aforementioned conversion rate of 0.970693 to account for the Square transaction fee.  The net amount, $11,590.08, was then transferred to LEWIS' BOA account ending in 4184 on 4/17/2020 at 7:12 AM.  A review of LEWIS' BOA account ending in 4184 shows that on the same day he received the incoming Square transfer, he used the BOA debit card associated with the account ending in 4184 to purchase twenty-two $500 gift cards worth $11,000 and $1,000 in the form of a "cash back" at a Lowe's Home Improvement Store (hereinafter "Lowe's") located at 3001 Battleground Avenue, Greensboro, NC 27408.  These gift cards are usable in a manner similar to cash.

60.    On May 29, 2020, I contacted Lowe's investigators regarding the above-mentioned gift card purchases.  Video surveillance from the Lowe's located at 3001 Battleground Avenue, Greensboro, NC 27408 on April 17, 2020, shows a white Dodge Charger, with a distinct paint scheme and custom parts, pull into the parking lot.  A black male matching LEWIS' description exits the vehicle, enters the store, and walks up to a Lowe's cashier.  The video shows the

25

individual believed to be LEWIS hand the cashier what appears to be several Lowe's gift cards. The individual believed to be LEWIS produces an identification card and a credit card to pay for the gift cards. The video additionally shows the individual believed to be LEWIS purchase the gift cards in three separate transactions. The date and time indicated on the surveillance video is consistent with Lowe's transactions records associated with purchases made on LEWIS' debit card associated with the BOA account ending 4184.

61. Records from the North Carolina Department of Motor Vehicles ("NCDMV") show that LEWIS has a white Dodge Charger vehicle bearing North Carolina tag HDT-1302 registered in his name. Between April 24, 2020 and June 9, 2020, I conducted surveillance at LEWIS' residence on numerous occasions. I repeatedly observed a white Dodge Charger, bearing North Carolina tag HDT-1302, parked in the front parking lot of the apartment complex. Additionally, LEWIS' white Dodge Charger bears the exact same paint scheme and custom parts as the Dodge Charger seen on the Lowe's Home Improvement video surveillance.

62. Based on information provided by Lowe's, at least one of the gift cards was redeemed at a Lowe's store in Winston Salem, North Carolina, on or around April 21, 2020. Video surveillance records associated with the gift card transactions show the individual redeeming the gift cards as an older white male, which does not match LEWIS's description.

63. In my training and experience, individuals who receive money related to a business transaction and immediately use the funds to purchase numerous gift cards in smaller value increments over several transactions usually do so in an effort to circumvent Bank Secrecy Act

26

reporting requirements, and ultimately sell the gift cards at a discounted rate to receive cash in order to conceal the origin of the funds.

64.     Analysis of bank records from April 17, 2020 and April 27, 2020, (*i.e.*, the period of incoming Square transactions described in paragraph 58) reveals that LEWIS executed seven online banking transfers from his BOA account ending in 4184 to his BOA account ending in 7577, totaling $75,000. *See infra* at Table 3.

**Table 3**

*LEWIS' Bank Transfers between BOA Accounts 4184 and 7577*

| Square to BOA Account 4184 | | | Transfers from BOA 4184 to 7577 | |
|---|---|---|---|---|
| **Date** | **Amount** | | **Date** | **Amount** |
| 4/17/2020 | $11,590.08 | | | |
| 4/20/2020 | $7,726.72 | | | |
| 4/20/2020 | $7,726.72 | | | |
| 4/20/2020 | $4,829.20 | | 4/20/2020 | $18,000.00 |
| 4/21/2020 | $17,385.12 | | 4/21/2020 | $18,000.00 |
| 4/22/2020 | $9,658.40 | | 4/22/2020 | $7,000.00 |
| 4/23/2020 | $7,726.72 | | 4/23/2020 | $9,500.00 |
| 4/24/2020 | $20,282.64 | | 4/24/2020 | $15,500.00 |
| 4/27/2020 | $11,590.08 | | 4/27/2020 | $4,000.00 |
| 4/27/2020 | $2,897.52 | | 4/27/2020 | $3,000.00 |
| 4/27/2020 | $965.84 | | | |
| **Total** | **$102,379.04** | | **Total** | **$75,000.00** |

65.     As previously detailed, between April 17, 2020 and April 27, 2020, a total of $105,470.00 was debited from the Square account ending G013X and credited to BOA 4184 (less fees). Of those funds, $75,000.00 was transferred from BOA ending 4184 to BOA ending 7577. As of the through date of available financial records, traced funds attributed to the COVD-19 grant

scheme were $6,570.00, $27,379.00, and $75,000.00 between G013X, BOA ending 4184, and BOA ending 7577, respectively. *See infra* at Table 4.

**Table 4**

*Trace Summary of COVID-19 Grant Fees*

| Date Range | Payments to Square G013X | Transferred from Square G013X to BOA 4184 | Transferred from BOA 4184 to BOA 7577 |
|---|---|---|---|
| April 15, 2020 to April 27, 2020 | $112,040.00 | | |
| April 17, 2020 to April 27, 2020[4] | ($105,470.00) | $102,379.04 | |
| April 20, 2020 to April 27, 2020[5] | | ($75,000.00) | $75,000.00 |
| Traced Balance to be Seized | $6,570.00 | $27,379.04 | $75,000.00 |

### In May 2020, LEWIS Created a New Website — "AmericanRelief.org" — Purporting to Offer Corporate-Sponsored Covid19-related Small Business Grants of $5,000

66. On May 13, 2020, I discovered that the covid19grant.org website was automatically redirecting visitors to the website americanrelief.org. A review of Namecheap records reveals that americanrelief.org is hosted by Namecheap and was created by LEWIS on May 3, 2020. The website lists the title "American Relief Fund" just above the following statement: "$5,000 grants for every American affected by COVID-19 (until the funds run out)," as shown in Image 1 below. The website additionally lists the following corporations underneath the heading, "Funded by Franchisees of America's Largest Corporation[s]": McDonald's, Subway, Re-Max, The UPS Store, GNC, H&R Block, Papa John's, and Planet Fitness, and contains well-known logos and/or

---

[4] A detailed summary of transactions from April 17 to April 27, 2020, is provided in Table 2.

[5] A detailed summary of the transactions from April 20 to April 27, 2020, is provided in Table 3.

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 29 of 69

trademarks of each such corporation, as shown in Image 2 below. A screenshot of AmericanRelief.org as it appeared on May 13, 2020, is attached hereto as Exhibit 3.

**Image 1**



**Image 2**



**Funded by Franchisees of America's Largest Corporations**

McDonald's · SUBWAY · RE/MAX · The UPS Store

GNC LIVE WELL · H&R BLOCK · PAPA JOHN'S · Planet Fitness

https://americanrelief.org                                                           1/3

5/13/2020                    American Relief Fund - $5,000 Grants for Every American

**A Few Words From Some of Our Funding Partners**

*I encourage everyone to apply for the American Relief Grant. I am happy to be part of the American Relief Grant program, a program that does not rely on taxpayer's money. We are coming together to do our part to help you get through this pandemic."*

KRISTI MILLER, SUBWAY OWNER

*I'm glad I was contacted to help fund the American Relief Fund. If you are in need of relief funds, I recommend you apply as soon as you can."*

SAM GERBER, MCDONALD'S OWNER

As previously mentioned in paragraph 28, Lewis made similar claims regarding corporations funding the first small business COVID-19 Relief Fund. LEWIS' purchase of americanrelief.org on May 3, 2020, offering $5000.00 in relief grants coincided with the $10 Billion in the SBA's available EIDL advance grant funds of up to $10,000 each running out on or about May 8, 2020.

 67. A review of the "Frequently Asked Questions" section of the americanrelief.org website makes reference to two email addresses associated with the domain: (1) hello@americanrelief.org and (2) media@americanrelief.org. Specifically, the website lists the following information pertaining to these emails:

30

> Be sure to add hello@americanrelief.org to your contact list so that our email notifications do not go to the spam/junk email folder[;]
>
> You can contact us by sending an email to hello@americanrelief.org.[;]
>
> For media inquires, including interview requests with franchisees who helped fund the American Relief Fund, please email us at media@americanrelief.org.

68.     On May 14, 2020, I contacted legal counsel for Planet Fitness World Headquarters, a franchisor of health gymnasiums through the United States, regarding claims made on americanrelief.org about Planet Fitness and any involvement the corporation may have with LEWIS. Planet Fitness legal counsel responded by stating that they have no affiliation with LEWIS or the americanrelief.org website.

69.     On May 22, 2020, I contacted representatives with The UPS Store, a franchisor of retail shipping and business service centers, regarding claims made on americanrelief.org about The UPS Store and any involvement the corporation may have with LEWIS. Representatives with The UPS Store confirmed the organization has never heard of the americanrelief.org or LEWIS. Representatives additionally advised that the americanrelief.org organization is not supported by The UPS Store and any claims made by the americanrelief.org website and LEWIS are therefore false and misleading.

70.     On June 3, 2020, I received a complaint referral regarding americanrelief.org. The complainant ("Complainant 4") advised that the apartment complex where he/she resides sent emails to tenants advising that the website americanrelief.org is providing individuals with COVID-19 relief grants. I subsequently called a management representative with the apartment complex who advised that the property manager ("Property Manager") sent the email to the tenants of numerous apartment complexes managed by Property Manager.

31

71. On June 8, 2020, I spoke with Property Manager who recalled viewing an article from USA Weekly that discussed the fund and provided me with the following link to the article: "https://usaweekly.com/home/5000-emergency-grants-available/." A review of this website reveals it to be titled, "$5,000 Emergency Grants for Every American." The article, which contains a press release date of May 30, 2020, provides information on how individuals can receive a $5,000 emergency grant. Furthermore, the article lists the following corporations as joining together to provide funding for the program: McDonald's, Re-Max, The UPS Store, Planet Fitness, Subway, Papa John's, H&R Block, and GNC. The article additionally contains hyperlinks that direct users to the americanrelief.org website in order to apply for the grant. As a result of the USA Weekly article and Property Manager's inability to find any concerning or negative information related to the website, Property Manager decided to forward the link to tenants who, Property Manager believed, could benefit from receiving a grant such as the one promised on americanrelief.org.

72. On June 12, 2020, I received another complaint referral regarding the website americanrelief.org. The complainant, who works in the legal department of the McDonald's Corporation ("Complainant 5"), advised that the website americanrelief.org, which purports to provide individuals with "American [Relief] Funds," falsely claims sponsorship by McDonald's. Furthermore, the website lists the following quote purportedly from a McDonald's franchise owner/operator:

> I'm glad I was contacted to help fund the American Relief Fund. If you are in need of relief funds, I recommend you apply as soon as you can
> SAM GERBER, MCDONALD'S OWNER

73. Complainant 5 was subsequently contacted by law enforcement for additional information. Complainant 5 stated McDonald's Corporation is not sponsoring a COVID-19 grant fund with americanrelief.org or otherwise. Further, McDonald's Corporation has no record of a

32

current or former owner/operator by the name of "Sam Gerber" as quoted on behalf of McDonald's on the americanrelief.org website. McDonald's Corporation legal team has sent a demand letter to the ISP hosting americanrelief.org, Namecheap, to have the website shut down for misusing the McDonald's "Golden Arches" trademark to perpetrate a fraud on consumers.

### There is Probable Cause to Believe that Records Relating to LEWIS' Covid-19 Grant Fraud Schemes Will be Found at the SUBJECT PREMISES

74.     Records from the NCDMV show that LEWIS previously lived at 4046 Battleground Ave., Apt 2B, Greensboro, NC 27410 which is an apartment located within the same apartment building as the SUBJECT PREMISES. As previously stated in paragraph 44 of this affidavit, LEWIS listed 4046 Battleground Ave., Apt 2B, Greensboro, NC 27410 as the office address associated with LRG when he incorporated the business through the North Carolina Secretary of State's Office.

75.     Vehicle dealer records related to the purchase of LEWIS' Dodge Charger show that LEWIS provided his North Carolina's driver's license number 26677686 to purchase the vehicle on January 28, 2020. On the credit application to finance the vehicle, LEWIS listed his gross monthly income as $8,614 and his employment status as self-employed with LRG. LEWIS additionally listed his address as 4046 Battleground Ave., Apt 2B, Greensboro, NC 27410 on the application.

76.     Records from the United States Postal Service show that in February of 2020, LEWIS and his roommate, C.K., submitted an official change of address request from apartment 2B to their current apartment, 3G, the SUBJECT PREMISES. Furthermore, on April 24, 2020, I spoke with the United States Postal Service letter carrier for 4046 Battleground Avenue, Greensboro, NC 27410, and he confirmed, after speaking with management at the apartment

33

complex, that LEWIS and C.K. were no longer living at apartment 2B and had recently moved to apartment 3G.

77.     On May 6, 2020, I conducted surveillance near the 4000 block of Battleground Avenue, and observed LEWIS' Dodge Charger bearing NC tag HDT-1302 driving northbound on Battleground Avenue towards the SUBJECT PREMISES. I observed the vehicle pull into the front office parking lot of the SUBJECT PREMISES apartment complex and back into a parking spot. I then observed a black male matching LEWIS' description exit the vehicle, walk to building number 4046, and walk upstairs (via an exterior outdoor stairway that can be seen from the parking lot) towards the SUBJECT PREMISES.

78.     On June 9, 2020, I attempted to interview LEWIS at his residence located at 4046 Battleground Ave, Apt. 3G, Greensboro, NC 27410. Shortly after knocking on the front door of the apartment, an individual who I identified as C.K. answered the door. C.K., who is LEWIS' roommate, confirmed his identity to me. I identified myself as a Postal Inspector and asked if LEWIS was inside the apartment. C.K. confirmed that LEWIS was inside the apartment and then walked back into the apartment. C.K. returned to the front door and advised that LEWIS requested I leave a message. I then informed C.K. to advise LEWIS that this was serious matter and that I needed to speak with LEWIS. C.K. then walked back into the apartment and left the front door partially opened. A few minutes later I observed someone close and lock the front door. I subsequently left a business card, which listed my email address, on the front door of LEWIS' residence.

79.     On June 10, 2020, I received an email from brandonrlewis@gmail.com, with the following message:

34

> Hello Mr. Sanabria, My name is Brandon Lewis. You visited my place of residence yesterday in Greensboro. How can I reach [you] directly by phone? Also, what is this in regards to? Brandon.

Several additional emails were exchanged, in which I advised LEWIS that I would be unavailable to speak until the following week and LEWIS replied, "Okay. Speak with you then."

80.     On June 11, 2020, Victim 1, who is referenced in paragraphs 50-54, contacted me about receiving the following email from brandon@lrg-group.net:

> We have a final update. You will be receiving only $3,000 in relief funds for each company. This is due to the large number of people that requested funds. Therefore everyone is receiving less. As promised you are entitled to a full refund. Even though you will be refunded, you will still receive the $3,000 in grant funds.
> I will disclose the name of the fund once everything is finalized. Will also inform you when the grant will be dispersed.
> Regarding the refund, you have two options:
> 1) Our credit card company can process the refund. The issue is that it can take 10 to 14 days to show up in your account.
> 2) You can call your bank/credit card company and request the funds be returned due to "service not delivered." You will immediately receive your funds rather than waiting 10 to 14 days. The bank will also immediately withdraw the funds from our account. We have to pay a "chargeback fee" but we are willing to eat that cost for the sake of you getting your funds back immediately.
> Which option do you prefer?

LEWIS sent the email to Victim 1 less than 48 hours after I attempted to interview him at his residence and the day after he emailed me at my official ".gov" email address regarding the same. In my training and experience, individuals who attempt to negotiate with victims in a scheme after being contacted by law enforcement typically understand that they have acted dishonestly and seek to obfuscate their conduct and/or "buy" time by portraying themselves, and the scheme, as being legitimate.

35

81.     I was additionally contacted by Victim 2, who is referenced in paragraphs 55 and 56 and who stated that on June 11, 2020, LEWIS sent Victim 2 the exact same email above from brandon@lrg-group.net.

82.     Records obtained from Charter Communications, Inc. (hereinafter "Charter"), a telecommunications company that offers internet, television and phone services, identify LEWIS' roommate, C.K., as the subscriber associated with IP address of 173.94.187.242, which has been linked to LEWIS and referenced throughout this affidavit. Furthermore, the records identify the SUBJECT PREMISES as the subscriber address. A review of the IP address activity previously discussed in this affidavit shows the link between the IP address 173.94.187.242 and LEWIS in communicating the scheme to complainants via email (discussed in paragraphs 17 and 34), in its use when creating domains connected to LEWIS and the scheme (discussed in paragraphs 19 and 29), and in its use in logging into online bank accounts connected to LEWIS and the scheme (discussed in paragraphs 46 and 57).

83.     As indicated in paragraph 43, LRG's purported business address 3859 Battleground Ave, Suite 206, Greensboro, NC 27410 is not a legitimate address.

84.     Based on my training and experience, it is likely that electronic devices containing digital records associated with the previously mentioned financial records, email correspondence, and online database records are maintained at the SUBJECT PREMISES, which is the physical location associated with the subscriber IP address of 173.94.187.242. It is also likely that individuals such as LEWIS, who have a substantial online presence and regularly visit internet-based databases, websites, and email services, use a variety of electronic devices, such as laptop computers, desktop computers, tablets, smart phones, and other digital media means, to access the

36

internet. Furthermore, based on my training and experience, it is likely that LEWIS uses electronic devices to store electronic data related to the scheme.

85.     Further analysis of subpoenaed records supports that LEWIS is utilizing a smart phone or other mobile device to further the COVID-19 grant scheme. For example, records obtained from Bank of America show successful logins to LEWIS's bank account portal on April 12, 2020 from IP address 107.77.241.52 and again on April 13, 2020 from IP address 107.77.253.12. Bank of America assigned an event description of "Mobile App Detection" to these logins. A WHOIS search found that these IP addresses belong to AT&T Wireless.

86.     Additionally, records obtained from Square show successful logins to LEWIS's Square account ending G013X on April 1, 2020 from 107.77.249.34, April 17, 2020 from 107.77.249.52, and May 21, 2020 from 107.77.249.10. A WHOIS search found that these IP addresses belong to AT&T Wireless.

87.     Based upon my experience and research, a mobile data network IP address will change as that mobile phone, laptop computer, or other mobile device switches between cell phone towers. In addition, the IP address for a mobile data network will renew (change) periodically even when a cell tower switch has not occurred.

88.     Financial records analysis found that LEWIS makes a monthly payment ranging from $50 to $60 to Cricket Wireless from BOA x4184. Based upon my research, Cricket Wireless is owned by AT&T. A mobile data connection for a Cricket Wireless cell phone plan would utilize AT&T Wireless network towers.

89.     Based upon my training, experience, and participation in investigations involving violations of financial crimes and related offenses, and my discussions with investigators involved in similar investigations, I know that businesses typically store their business records at their

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 38 of 69

business location. Such records would include bank statements, check stubs, checks, deposit slips, payment records, invoices, correspondence with customers and others, emails, faxes, letterheads, and client files. These records can be maintained in paper form or electronically filed on laptops, smartphones, and other digital storage devices. The investigation has revealed, for example, that within the last 60 days LEWIS has received LRG-related Bank of America account records at the SUBJECT PREMISES via the United States Postal Service.

### Computers, Electronic Storage, and Forensic Analysis

90.     As described in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, identified in Attachment A in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

91.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe records will be stored on that computer or storage medium, for at least the following reasons:

    a.    Based on my knowledge, training, and guidance from Computer Forensic Analysts with the United States Postal Inspection Service, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools.

38

This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

92. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of

39

their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and "chat" programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. (A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, floppy disks, flash memory, CD-ROMs, and several other types of magnetic or optical media not listed here.) This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"

40

instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

41

93.     In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy known as a mirror image of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on the premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer

42

hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

94.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

95.     It is possible that the SUBJECT PREMISES will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

96.     Based upon my training and experience and the investigation described above, I submit that there is probable cause to believe that LEWIS has violated the criminal statutes listed

43

above and that evidence, fruits, and instrumentalities of these crimes as described in Attachment B are contained within the SUBJECT PREMISES, described in Attachment A.

97.     Based upon my training and experience and the investigation described above, I submit there is probable cause to believe that:

        a.     All funds on deposit up to a total of $27,379.04 in Bank of America account number 237035544184 in the name of DBA Lewis Revenue Group, Brandon Lewis Sole Prop;

        b.     All funds on deposit up to a total of $75,000.00 in Bank of America account number 237041857577 in the name of Lewis Revenue Group L.L.C.; and

        c.     All funds on deposit up to a total of $6,570.00 in Square account identification number 9PZH61WZG013X in the name of Lewis Revenue Group,

constitute or are traceable to offenses constituting "specified unlawful activity" (as defined in Title 18, United States Code, Section 1956(c)(7)), specifically violations of Title 18, United States Code, Sections 1343 (wire fraud), and are therefore subject to seizure and forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C).

44

## REQUEST FOR SEALING

98.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,


/s/ Alberto G. Sanabria
Alberto G. Sanabria
Postal Inspector
United States Postal Inspection Service


In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 23rd day of June, 2020, at 5:15p.m.



Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

45

## ATTACHMENT A

### Property to Be Searched

This warrant applies to items and information associated with the SUBJECT PREMISES: 4046 Battleground Avenue, Apartment 3G, Greensboro, NC 27410.

The SUBJECT PREMISES can be further described as:

An apartment located on the third floor of a three-story apartment building with cream and brick siding and black shingled roof. The apartment faces the front parking lot of the apartment building and is accessed from the right stairwell of the 4046 Building. The apartment is the first unit on the right side when exiting the front stairwell of the building. The apartment door displays a sign "3G" to identify the unit.

A photograph of the SUBJECT PREMISES is below:



## ATTACHMENT B

### Items at Premises to be Seized by the Government

The items to be seized are evidence of violations of Title 18, United States Code, Section 1343 (Wire Fraud), 18, United States Code, Section 1956 (Laundering of Monetary Instruments), and 18, United States Code, Section 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), involving BRANDON RASHAD LEWIS and occurring on or after January 1, 2020, in the form of:

1. Documents, photographs, and information, in whatever form, showing possession, occupancy, dominion, and control over the SUBJECT PREMISES.

2. Records and items, in any form, which constitute evidence of person(s) committing the SUBJECT OFFENSES.

3. Records and items, in any form, which constitution evidence of concealment of the SUBJECT OFFENSES

4. Documents, photographs, and information, in whatever form, containing personally identifiable information, corporate information, federal tax identification, and banking information of people or corporations believed to be victims of the scheme.

5. Business and financial records, in whatever form, of LEWIS, Lewis Revenue Group, and related entities, including but not limited to, merchant payment services, credit card processing services, bank account and credit card statements, checks, deposit slips, deposit items, cashier's checks, money orders, wire transfers, and cash withdrawals.

6. U.S. currency, gift cards, or stored value cards.

7.    Any laptop computers, desk top computers, electronic tablets, smart mobile telephones, and any other devices capable of storing data and accessing websites for the purpose of committing the SUBJECT OFFENSES ("COMPUTERS").

## COMPUTERS

The term "computer," as used here, is defined as an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

1. Any computers (including file servers, desktop computers, laptop computers, mainframe computers, smart phones, and mobile devices), input/output devices, software, documentation, data security devices and storage devices (such as hard drives, Zip disks, floppy disks and thumb drives) that are found on the premises to be searched, in order to examine those items for records as described in this list of Items To Be Seized. Smart phones, cellphones or other mobile devices will be limited to those associated with Relevant Parties.

2. Any records, documents, materials and files described in the aforementioned affidavit which are maintained on a computer or preserved in files that have been "deleted" from computer storage devices or facilities. The terms "records", "documents", "materials", and "files" include all information preserved in any form, visual, magnetic, electronic or aural, including the originals and all non-identical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise. These definitions apply regardless of the form in which such records, documents, materials and files, including any drafts or modifications, may have been created or stored; any

2

photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as writing, printing or typing); any computerized, electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as hard disks, CD-ROMS, optical discs, printer buffers, smart cards, memory calculators, electronic dealers, Thumb Drives, Flash media, ZIP drives, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

3. Special agents are authorized to seize and remove from the premises any computer hardware including computer system input/output (I/O) peripheral devices and software so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

4. The government will retain a forensic image of each electronic storage device subjected to analysis for a number of reasons, including proving the authenticity of evidence to be used at trial; responding to questions regarding the corruption of data; establishing the chain of custody of data; refuting claims of fabricating, tampering, or destroying data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

5. If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the Company's computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the premises and

3

returned within three business days. If additional time is needed for imaging, agents may request additional time from the Court.

6. If computer components are seized, the Company can request the agents, to the extent practicable, to attempt to provide the Company with copies of data that may be necessary or important to the continuing function of the Company's legitimate business.

7. Special agents and computer analysts working with special agents are authorized to seize the relevant system software (operating systems, interfaces, and hardware drivers), any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices, including, but not limited to, passwords, keycards, and dongles. In addition, they are authorized to reconfigure the system as it now operates in order to accurately retrieve the evidence stored therein.

8. In regard to the inspection of computers and the context of related equipment for records, documents, materials and files within the scope of this warrant, special agents are authorized to analyze the electronically stored data, whether on-site or in a laboratory or other controlled environment, using the following techniques: (a) surveying various file "directories" and the individual files they contain in order to locate evidence and instrumentalities authorized for seizure by the warrant; (b) "opening" or reading the first few "pages" of such files in order to determine their precise contents; (c) "scanning" storage areas to discover and possibly recover deleted data; (d) "scanning" storage areas for deliberately hidden files; and (e) performing electronic "key word" searches through all electronic storage areas to determine

4

whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

9. This warrant specifically authorizes the creation of a "mirror image" of a drive or other storage device or media for use in an off-site search. In that event, the agents are authorized to use the above search techniques, for said search.

5

# EXHIBIT 1



# The Most Important Article You Can Read

Don't lose out on COVID-19 relief funds for your business.

---

# I will share with you two things...

1) How to receive a **guaranteed $15,000 relief grant** for your small business from a new COVID-19 relief fund.

2) The huge mistake that completely disqualifies you from receiving the SBA's emergency relief grant of up to $10,000.

# First, who am I?

My name is Brandon Lewis, President and Founder of investment firm Lewis Revenue Group. I was one of the first individuals to make an announcement about the SBA's emergency relief grants for small businesses.

Forbes magazine interviewed me on March 17th about the SBA relief grants:

**Forbes**  Billionaires   Innovation   Leadership   Money   Business   Small Business   Lifestyle

To help you understand more about one of the government's bailout
packages, I spoke with Brandon Lewis, President of Lewis Revenue
Group, an investment firm in North Carolina. "Every small business in the
United States has the opportunity to receive a grant up to $10,000 from
the government to help soften the blow of the pandemic," says Lewis.
"This money will not have to be paid back. To be considered for the grant,
you first have to apply for the SBA's Economic Injury Disaster Loan
(EIDL). The up to $10,000 grant is technically an 'advance' on the loan
you are applying for. You can receive the advance whether or not you are
approved for the loan. And it does not have to be paid back."

Click here to read the full article on Forbes. In addition to Forbes, I have
been featured on Inc, Fortune, Business Insider, and many other major
business publications.

Now enough about me. Let's talk about you.

First, I will discuss the huge mistake that completely disqualifies you from
receiving the SBA's emergency relief grant of up to $10,000. Secondly, I will
discuss a guaranteed way to receive a $15,000 relief grant for your small
business from a new COVID-19 relief fund.

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 56 of 69

# The huge mistake that disqualifies you
# from getting the SBA Grant

I'm sure by now you have heard about the SBA's small business grant for up to $10,000. Hopefully you have already submitted an application. On Friday, April 11 the SBA began depositing grants into bank accounts, which is wonderful news.

Here is the huge mistake that a lot of small businesses are making...

There is a section on the application where you enter your bank account information. Since the application did not specifically ask for the name on the bank account, many people assume they can enter any bank account they want.

Wrong.

People are using bank accounts where the name on the account is registered to spouses, partners, parent companies, etc. This is a big mistake. The name on the bank account must match either 1) the name of the company on the application, or 2) the first and last name of the owner

Case 1:20-mj-00169-JLW    Document 1    Filed 06/23/20    Page 57 of 69

of the business on the application. If there is no match, you will NOT receive the grant funds. Your grant deposit will be rejected.

Below are a few examples of instances where people are making this huge mistake:

**Instance #1** - A husband completes the application using his own information, but enters his wife's bank account information. If the husband's name is not on his wife's bank account, the grant deposit will be rejected.

**Instance #2** - A CPA completes the application on behalf of his/her client and uses the client's information on the application. The CPA enters their own bank account information with the ultimate goal of forwarding the funds to their client. Big mistake. The grant deposit will be rejected.

**Instance #3** - A parent company called ABC Parent Company owns multiple businesses. The parent company applies for grants for each individual business it owns, using information for each business on the application. The parent company's bank account information is submitted on each application. The grant deposit will be rejected.

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 58 of 69

In summary, when applying for the emergency grant from the SBA, make sure the name registered to the bank account you submit matches either 1) the name of the company on the application, or 2) the first and last name of the owner of the business on the application.

If you made the mistake I described above, go re-submit your application ASAP. The SBA will use the information on your most recent application. Understand that if you have to re-apply, it will push you to the back of the line.

The last thing I want to mention about the SBA grant is this. The SBA emergency relief grant is not guaranteed to be $10,000 for every small business. The grants are based on your number of employees. You get $1,000 for each employee. So if you have 2 employees, you get $2,000.

Don't be shocked if you don't get the full $10,000 if you have less than 10 employees. If you already applied and you didn't make any mistakes, keep checking your bank account. The SBA began depositing grants on Friday, April 11.

# Guaranteed $15,000 relief grant from a brand new COVID-19 relief fund

Case 1:20-mj-00169-JLW    Document 1    Filed 06/23/20    Page 59 of 69

Pay close attention.

I am about to show you how to get a guaranteed $15,000 grant for your small business (in addition to the SBA grant). Since the COVID-19 pandemic began, corporations have been launching their own COVID-19 relief funds, such as Visa, Wells Fargo, Facebook and Sony.

There is a brand new COVID-19 relief fund for small businesses that is being funded by multiple corporations. The corporations are combining their funds to create one of the largest corporate funded COVID-19 relief funds to date.

Every approved small business application will receive exactly $15,000. Unlike the SBA grants, it doesn't matter how many employees you have. Everyone gets $15,000 if your application is approved.

The fund has up to $250 million available for small businesses (and up to $150 million for individuals). The grants are awarded on a first come first serve basis.

Here is why you can trust me to provide 100% accurate information about this new relief fund: **Our investment firm set up this COVID-19 relief fund!**

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 60 of 69

Our company, Lewis Revenue Group, worked together with multiple corporations to organize the largest corporate funded COVID-19 relief fund to date. You can read about it on USA Weekly, NBC News, CBS News, The Boston Herald, Fox News, and more.

In a nutshell, the fund is open to every small business in the United States with less than 200 employees. The fund will be open for applications early next month.

The $15,000 grants are awarded on a first come first serve basis. We expect the grants to be gone within the first few hours of the relief fund being open for applications.

Over 87 media outlets are lined up to write about the new relief fund as soon as it is open for applications, including The New York Times, The Wall Street Journal, CNN, TODAY Show, USA Today, The Washington Post, etc.

# How to guarantee yourself $15,000 for your small business

I am allowing a very small number of businesses to purchase a reservation to receive a grant. With this reservation, a $15,000 grant will be reserved for you until you submit your application early next month.

Case 1:20-mj-00169-JLW    Document 1    Filed 06/23/20    Page 61 of 69

You are guaranteed a $15,000 grant, as long as you have 200 employees or less.

As the creator and administrator of this relief fund, I have the sole power and authority to reserve grants for small businesses.

Again, we estimate the grants will be gone within hours of being open for applications. A reservation gaurantees you a $15,000 grant and you don't have to worry about missing the short window to submit an application.

If you want to purchase a reservation, click here to purchase your reservation for $1200. For all reservation holders, I will send you a link to the application as soon as the relief fund is open for applications, which is early next month.

Once the relief fund is open for applications, your reservation holds your $15,000 grant for 7 days. If you have a reservation you are guaranteed to be awarded the $15,000 grant as long as you submit your application within the first 7 days of the relief fund being open for applications.

Grants will be dispersed via direct deposit beginning two weeks after the relief fund is open for applications. Everyone that is awarded a grant will

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 62 of 69

receive an email that instructs you to be on the look out for a direct deposit at your bank.

If you want to purchase a reservation and lock in your $15,000 grant, click here to purchase a reservation for $1200. Again, we estimate the grants will be gone within hours of being open for applications. A reservation locks in your grant and you don't have to worry about missing the short window to submit an application.

When purchasing a reservation, be sure to submit your primary email address so you don't miss our email alerting you that the relief fund is now open for applications.

# Click Here to purchase a reservation now

If you have questions, you can email me at brandon@lewisrevenuegroup.com

P.S. I will be providing reservations to only a small number of companies. As soon as reservations are gone, the opportunity to purchase a reservation will be removed.

Case 1:20-mj-00169-JLW   Document 1   Filed 06/23/20   Page 63 of 69

# Contact Us

**Email:** info@lewisrevenuegroup.com

**Phone:** 1 (888) 221-9073

**Address:** 3859 Battleground Ave, Suite 206, Greensboro, NC 27410

© 2020 Lewis Revenue Group - All rights reserved.

# EXHIBIT 2



# EXHIBIT 3



**AmericanRelief.org**

# American Relief Fund

$5,000 grants for every American affected by COVID-19 (until funds run out). Funded by franchisees of America's largest corporations.

**Learn More**  **Begin Application**

## Funded by Franchisees of America's Largest Corporations

   

   

## A Few Words From Some of Our Funding Partners

*I encourage everyone to apply for the American Relief Grant. I am happy to be part of the American Relief Grant program, a program that does not rely on taxpayer's money. We are coming together to do our part to help you get through this pandemic."*

KRISTI MILLER, SUBWAY OWNER

*I'm glad I was contacted to help fund the American Relief Fund. If you are in need of relief funds, I recommend you apply as soon as you can."*

SAM GERBER, MCDONALD'S OWNER

## Frequently Asked Questions



| 1 | Who is eligible for the American Relief Grant? |
| 2 | How much is the American Relief Grant? |
| 3 | How do you decide who is awarded the American Relief Grant? |
| 4 | If I am awarded the American Relief Grant, how do I receive the funds? |
| 5 | How long will you be giving away $5,000 American Relief Grants? |
| 6 | Does the American Relief Grant have to be paid back? |
| | No, the American Relief Grant does not have to be paid back. |
| 7 | After I apply will you notify me if I am awarded or denied the American Relief Grant? |
| 8 | How long does it take to be notified if I was awarded or denied the American Relief Grant? |
| 9 | After I apply, how do I check my current status? |
| 10 | Can business owners apply for the American Relief Grant? |
| 11 | Once I have been awarded the American Relief Grant, how long does it take for my check to arrive? |
| 12 | Are there any restrictions on how the funds can be used? |
| 13 | What if I make a mistake on the application? Can I re-apply? |
| 14 | Can I receive more than one American Relief Grant? |
| 15 | How do I apply? |
| 16 | If I have questions, how do I contact you? |

© Copyright 2020 AmericanRelief.org